Churchill Farms, Inc., [1] Petitioner v. Commissioner. Churchill Farms, Inc. v. Commissioner
Docket No. 6307-66.
United States Tax Court
T.C. Memo 1969-192; 1969 Tax Ct. Memo LEXIS 106; 28 T.C.M. (CCH) 990; T.C.M. (RIA) 69192; September 23, 1969, Filed deQuincy v. Sutton, Greater Mississippi Life Bldg., Meridian, Miss., for the petitioner. William O. Lynch and Harold Friedman, for the respondent. FEATHERSTON
Memorandum Findings of Fact and Opinion FEATHERSTON, Judge: Respondent determined deficiencies in petitioner's income and personal holding company taxes and additions to tax under section 6653(a) [2] as follows: 991 Year
Income Tax
Personal Holding Company Tax
Addition to Tax,Sec. 6653(a)
Total
1959
$ None
$ 8,236.15
$ None
$ 8,236.15
1960
17,953.56
32,455.79
2,520.47
52,929.82
1961
13,082.56
30,175.34
2,162.90
45,420.80
1962
7,757.67
21,471.18
1,461.44
30,690.29
1963
15,275.77
36,642.37
2,595.91
54,514.05
1964 6,395.23
22,147.64
1,427.14
29,970.01
Total
$60,464.79
$151,128.47
$10,167.86
$221,761.12 Certain issues have been settled by the parties. The issues remaining for decision are: (1) What amounts, if any, petitioner is entitled to deduct under section 162(a) as expenses for repairs and maintenance for the years 1960 through 1964; whether the amounts which are not deductible may be capitalized under section *110 263(a). (2) What amounts, if any, petitioner is entitled to deduct under section 167(a) for depreciation for the years 1960 through 1964. (3) Whether respondent erred in disallowing part of the deductions claimed by petitioner under section 162(a) as expenses for insurance and sundry items for 1960, 1961, and 1962. (4) Whether, for 1960, petitioner is entitled under section 162(a) to a deduction for truck repairs. (5) What amounts, if any, petitioner is entitled to deduct under section 162(a) (1) for salaries and wages, including social security and withholding taxes, for the years 1960 through 1964. (6) What amounts, if any, petitioner is entitled to deduct under section 162(a) for legal services for 1961, 1962, 1963, and 1964. (7) Whether, for 1961, petitioner is entitled to a deduction under section 162(a) for amounts paid as "Release of Damages." (8) Whether petitioner is entitled to deductions under section 162(a) (1) for a supervisor's fee in the amount of $10,000 for each of the years 1962 and 1963. (9) Whether, for 1963, petitioner is entitled to a deduction under section 162(a) for "Miscellaneous" expenses. (10) Whether, in computing the deduction for percentage *111 depletion, petitioner is entitled under section 613 to include in its "gross income from the property" the amounts of its legal fees paid by its lessees in 1961 and a deposit of $8,635.38 made in 1963. (11) Whether petitioner is subject to the personal holding company tax imposed by section 541 for the years 1959 through 1964. The resolution of this issue depends on whether oil lease bonuses received by petitioner during each of these years, and amounts corresponding with deductions for depletion taken in prior years and reported as gross income in each of these years, constitute personal holding company income within the meaning of pre-1964 section 543 (a) (8) for 1959 through 1963, and section 543(a) (3), for 1964. (12) Whether all or any part of the underpayments of income tax due by petitioner for the years 1960 through 1964 are due to negligence or intentional disregard of the rules and regulations within the meaning of section 6653(a). Findings of Fact Churchill Farms, Inc. (hereinafter referred to as petitioner), had its principal office in New Orleans, Louisiana, *112 at the time of the filing of its petition. Petitioner filed its Federal corporate income tax returns for the calendar years 1959 through 1964, inclusive, with the district director of internal revenue, New Orleans, Louisiana. During the years in controversy petitioner owned a tract of land consisting of approximately 4,200 acres, located in Jefferson Parish, Louisiana, 10 miles west of, and across the Mississippi River from, downtown New Orleans. Access to the property from New Orleans is by two bridges across the Mississippi - one bridge connected with downtown New Orleans, the other six miles upstream. The tract borders on Lake Cataouatche, an access route to the intercoastal waterways, and is subject to tidal flow from the lake. Like the other low-lying lands around New Orleans, it would be three feet below mean sea level if drained. The tract includes an area of approximately 835 acres - known as the "ponds" because of the presence of numerous small bodies of water - around which a protective levee was constructed about 1927 and for which a drainage system was developed. 992 The ponds area is anywhere from three to four feet below the level of the land outside the levee *113 - known as the "trembling prairie" - and was farmed in earlier years. Located within the ponds area are a headquarters building, a caretaker's dwelling, a boathouse, some wharves, and a storage building. The trembling prairie is, for the most part, covered with three feet of water, upon which about one foot of humus floats. It is shaped like a bowl and has the appearance of surface land, but it will not bear the weight of a man for any substantial length of time. A few years prior to 1964 the Lafourche Levee District was established for the purpose of installing a levee and drainage system which was to encompass parts of Jefferson, St. Charles, and Lafourche Parishes, protecting these areas from the waters of Lake Cataouatche. The Lafourche Levee District obtained rights of way and commenced digging in 1964. Jefferson Parish also commenced constructing drainage canals and pumping stations which, with the levee, were to provide a complete protection and drainage system. Most of petitioner's land was within the area to be protected. A part of the Lafourche system is a carryoff canal which, in part, roughly parallels petitioner's boundary line. During the years here in issue petitioner's *114 income was derived from oil and gas leases covering portions of its land. Issue 1. Repairs and Maintenance 1960 At the beginning of 1960 the existing improvements on petitioner's land were old and deteriorated. They had been constructed or installed prior to 1925, and few steps had been taken to keep them in repair. In 1960 petitioner, under new ownership, commenced a major construction program, related to existing, as well as new, improvements, including the construction of a new headquarters building. The headquarters building was a 30-foot by 40-foot frame building with a plywood exterior and wood panel interior. It contained three bedrooms, two of which were furnished, a large combination living and dining room with a large table, a kitchen with a built-in oven and range, as well as a refrigerator and a deep freezer, and two and one-half baths. Carpeting and drapes were not furnished until 1965. The large combination room was frequently used by petitioner for meetings with prospective purchasers, conferences with businessmen, engineers, and representatives from parish agencies to discuss the parish drainage program (which was to affect petitioner's land), discussions *115 with prospective oil lessees, and annual shareholder meetings. In addition, petitioner kept various records there, including maps and surveys. The headquarters also was used as a departure point for helicopter and boat trips (within the ponds are) to inspect the operations of the oil lessees on petitioner's property. In its return for 1960 petitioner claimed deductions for repairs and maintenance totaling $40,007.42; respondent disallowed the full amount of these deductions. Petitioner concedes that of the amount deducted, the sum of $18,413.28 represents capital expenditures rather than expenses deductible for 1960. A description of the items remaining in issue and the amounts deducted for each follows: (1) Construction work, $9,638.38. The contractor made numerous improvements to the caretaker's building, consisting of installation of plumbing and heating facilities; replacement of one-third of the windows, some exterior and interior doors, and several ceilings; and a large amount of work on the roof. This work materially added to the life of the building. The contractor also installed a new floor in the storage building, completely rebuilt the wharves, walkways, and boathouse *116 roof, and replaced one-half of the interior supports and one-third of the roof of the pumphouse. (2) Part-time labor, $90, and photostats of pump design, $9,89. These expenditures were incurred in connection with the above construction. (3) Sand and shells, $2,629.08. These materials were used to rebuild the existing access road which had deteriorated to the extent that some portions of it were impassable. Substantially all deliveries of the materials were made within a three-month period, approximately 80 percent having been delivered on two days. (4) Surveys, $8,092.80. This expenditure was incurred for the preparation of survey maps showing the location of petitioner's tract in relation to adjacent tracts, roads, canals, and other physical features, and the placement of 48 section markers on both the exterior and the interior section lines of petitioner's land; land marks 993 viously used, installed before 1925, had largely disappeared or were unreliable. Petitioner utilized the survey maps and section markers in managing its land - in locating lease areas and oil wells, in dredging access canals, in checking the progress and location of such wells and canals, in negotiating *117 leases, in preparing drainage plans, and in deciding as to the use of the land. The survey expenses consisted of the following: Section markers and cement
$ 287.58
Drafting of survey maps
1,090.00
Field survey, transportation, etc. 6,715.22
Total
$8,092.80 Of this total amount, $1,600 is attributable to placement of the section markers. (5) Helicopter, $385.07. This outlay covered the cost of two trips between a motel and an airport (with a stopover on one trip at petitioner's property) and one trip from an airport to Westwego, Louisiana. Passengers on these trips included stockholders of petitioner as well as other individuals. The record does not disclose that these expenditures were incurred for business reasons. (6) Marsh buggy rental, $625; fuel for pump, $102.98; printing lease forms, $20.76. The item claimed as a deduction for marsh buggy rental was, in fact, an expense incurred for the rental of a dragline used in connection with capital construction. The pump was used to remove excess water from the property, thereby preventing damage to the structures within the levee and to the levee itself. The mineral leases for which these forms were used *118 were terminated or abandoned within one year. The following table sets forth for the items remaining in issue for 1960 the amounts which must be capitalized, the amounts which are deductible expenses for that year, and the amount which is neither: Item
Amount in
To be To be To be Issue Capitalized Expensed Disallowed
Construction work
$ 9,638.38
$ 9,638.38
Part-time labor
90.00
90.00
Photostats
9.89
9.89
Sand and shells
2,629.08
2,629.08
Surveys
8,092.80
1,600.00
$ 6,492.80
Helicopter
385.07
$385.07
Marsh buggy rental
625.00
625.00
Fuel for pump
102.98
102.98
Printing forms 20.76
20.76
Total
* $21,593.96
$14,592.35
$6,616.54
$385,07
* The discrepancy of $0.18 between the amount deducted ($40,007.42) and the sum of the amount conceded ($18,413.28) plus the total amount remaining in issue is unexplained by the record. 1961 In its return for 1961 petitioner claimed deductions for repairs and maintenance totaling $25,366.29; respondent disallowed the full amount of these deductions. Petitioner concedes that, of the amount deducted, the sum of $1,575.79 is a capital expenditure. A description of the items *119 remaining in issue and the amounts deducted for each follows: (1) Sand and shells, $14,893.82; fertilizer and grass seed, $208. Prior to 1961 the levee around the ponds area was broken in several places. In fact, only 50 to 78 percent of the levee, which was 12,500 feet long, was above water within the enclosure. On March 27, 1961, petitioner entered into a contract with Damco, Inc., for the rebuilding of this levee to a uniform height for a contract price of $13,500. When finished, the levee had a 15-foot wide crown and was topped with an all-weather road on which trucks and heavy vehicles could travel. In addition to the earth used in building the levee, at least 1,500 truckloads of sand were used, along with large quantities of shells. Fertilizer and grass seed were purchased for use in seeding the banks of the levee. (2) Surveys, $2,274.51. This expenditure was for services similar to those rendered in 1960, and for updating the survey, e.g., recording the location of new oil wells which were drilled after the 1960 survey work was done. (3) Helicopter and seaplane, $947.92. The following trips were made by helicopter: 994 Passengers
Destination
Cost
Carlos Marcello
To PHI Ferry
$116.67
J. Folse Roy
Local (Churchill Farms)
158.33
Carlos Marcello, J. Folse Roy, and Hooten
Churchill Farms and local
260.42
J. Folse Roy
Ferry to Grand Isle 187.50
Total
$722.92
*120 The trip to PHI Ferry was unrelated to petitioner's business. The J. Folse Roy local trip and trip to Grand Isle were made to inspect petitioner's tract outside the levee and to attend a meeting at an oil lessee's office at Grand Isle, respectively. The trip on which Hooten was a passenger was taken in connection with negotiations, which subsequently failed, for the development of the tract. Accordingly, $606.25 of the helicopter expenses was directly related to petitioner's business activity, and the remaining $116.67 was not shown to have been incurred in petitioner's business or in the management of its property. Petitioner also incurred seaplane expenses in the amount of $225 for trips to Grand Isle for conferences with an oil lessee. (4) Marsh buggy rental, $182. The marsh buggies provided surface transportation used in the management of petitioner's property in the prairie area, e.g., to determine the best location of canals, to acquire information on the progress of the construction of such canals, and to observe lessees' activities in oil explorations and drilling. (5) Electrical work, $73.60. Of this amount, $7.21 was related to rewiring the caretaker's house; the remaining *121 $66.39 covered repair of the heating and airconditioning systems and oven at the headquarteers. (6) Other contract services, $65.04; work on bridge, $383.51; hardware supplies, $991.40. The "other contract services" were related to the capital construction program initiated in 1960. The repair work on the bridge involved replacing broken planks. The hardware supplies consisted of screen door material and related items, roofing material, lumber, paint, tools, hardware cloth (for weather screening) and related materials, hog and barbed wire, gravel concrete mix, plumbing supplies, and electrical wire and fittings. (7) Weed killer, $903.18; work on outboard motors, $112.24; motor parts, $5.49. The weed killer was used to destroy water lilies which made the ponds and canals impassable and also clogged the pump. The outboard motors propelled boats used in shredding the lilies to prevent them from clogging the drainage pump. Constant repairs were required on these motors since they rapidly burned out or were clogged by bits of water lilies. (8) Work on pump and supplies, $442.20. This item consisted of the following expenditures: Item
Cost
Packing fit, ball bearing, pipe union, and labor
$162.53
Installation of new engine and pulley
53.66
Fishing worms, soft drinks, mounted fish and fowl, 21 bales of hay, etc.
84.02
Bolts, screws, pipefittings, nails, heater repair, lumber glass, light bulbs, etc. 141.99
Total
442.20
*122 The expenditures of $84.02 for fishing worms, etc., were not shown to be related to petitioner's business. (9) Motor fuels, $581.49. Invoices documenting purchases of $398.11 were introduced into evidence. Of this amount, $195.29 constituted expenditures for the personal use of Carlos Marcello, a shareholder in petitioner; the remaining $202.82 represented purchases made by an employee of petitioner for use in petitioner's pickup truck (the only land motor vehicle petitioner owned at this time) and in the pump and outboard motors. Of the total expenditures, $281.49 was incurred in petitioner's business. (10) Civil engineer's expenses, $625.50, consultant's fee, $100. During 1961 petitioner employed a civil engineer, who incurred travel expenses in an effort to obtain approval of a Federal land reclamation project for the drainage of an area including petitioner's property. In this connection the consultant's planning fee of $100 was also incurred. The civil engineer's services and the consultant's work did not bear fruit and were abandoned without any lasting benefit to petitioner. (11) Public utility electricity, $63.62; pest control services, $151.16; insurance premiums, $741.12; *123 "No Dumping" signs, $27.51; photos, $17.51. The public utility electricity and pest control services were 995 used at the caretaker's house and the headquarters. The insurance premiums were expended on the following policies: Coverage
Premium
Bayou Verret Land Co., Inc.
$360.50
Caretaker's house and pumphouse
88.70
(fire and extended coverage)
Headquarters
291.92
(fire and extended coverage)
Total
$741.12 The premium for insurance on Bayou Verret Land Co., Inc.'s property did not benefit petitioner. The premiums for the headquarters and the caretaker's house and pumphouse were incurred for protection against the general risks related to petitioner's property. The "No Dumping" signs were not shown to have useful lives of less than one year. The photos were of the community area and were not shown to have been related to petitioner's business. The following table sets forth for the items remaining in issue for 1961 the amounts which must be capitalized, the amounts which are deductible expenses for that year, and the amounts which are neither: Item
Amount in To be To be
To be
Issue Capitalized
Expensed Disallowed
Sand and shells
$14,893.82
$14,893.82
Fertilizer, grass seed
208.00
208.00
Surveys
2,274.51
$2,274.51
Helicopter, seaplane
947.92
831.25
$116.67
Marsh buggy rental
182.00
182.00
Electrical work
73.60
7.21
66.39
Other contract services
65.04
65.04
Work on bridge
383.51
383.51
Hardware supplies
991.40
332.52
658.88
Weed killer
903.18
903.18
Work on motors
112.24
112.24
Motor parts
5.49
5.49
Work on pump
442.20
358.18
84.02
Motor fuels
581.49
140.75
140.74
300.00
Engineer's expenses
625.50
625.50
Consultant's fee
100.00
100.00
Electricity
63.32
63.32
Pest control
151.16
151.16
Insurance premiums
741.12
380.62
360.50
"No Dumping" signs
27.51
27.51
Photos 17.51
17.51
Total
* $23,790.52
$15,674.85
$7,236.97
$878.70
*124 * The discrepancy of $0.02 between the amount deducted ($25,366.29) and the sum of the amount conceded ($1,575.79) plus the total amount in issue is unexplained by the record. 1962 For 1962 petitioner claimed deductions of $17,315.65 for repairs and maintenance, all of which respondent disallowed. Petitioner concedes that of such amount, $1,248.74 (including $300 for steel stringers and sides for the main bridge) constitutes capital expenditures. A description of the items remaining in issue and the amounts deducted for each follows: (1) Surveys, $846.68; blueprint copy, $9.52. The survey services were a continuation of those rendered in 1960 and 1961; the blueprint copy was related to these services. (2) Engineering services, $621.76. A petroleum engineer conducted a geological or engineering study which was of value to petitioner in the negotiation and management of a particular oil and gas lease. (3) Weed killer, $505.88; exterminator, $120; sand and shells, $18; electricity, $563.83. The expenditures for weed killer and exterminator services are similar to deductions claimed for such items in 1961. The sand and shells were used in maintenance of the existing access *125 road. The expenses for electricity were similar to those incurred in 1961, and were required for business reasons. (4) Painting, $1,293. This expense was incurred in painting three sheds, the headquarters, and the caretaker's house. (5) Electrical work and supplies, $232.60. These expenditures consisted of $214.10 for the replacement of a pump and water system and $18.50 for minor repairs on the headquarters and caretaker's house. (6) Hardware supplies, $1,819.27. This item includes expenditures for supplies used 996 in rebuilding the caretaker's cottage, as follows: $528.08 for supplies used in replacing walls and ceilings, installing indoor plumbing, and in building a fence; $116.56, documented by an invoice which does not indicate what items were purchased; and $200.10 for lumber (eight 2 X 6's, thirty-two 4 X 12's, twelve 2 X 8's, and thirty 1 X 8's). All of the above items are capital in nature. The remaining purchases, in the amount of $974.53, included such maintenance items as hardware cloth, paint and paint brushes, nails, screws and bolts, sandpaper, plywood, and small purchases of lumber in random sizes. (7) Work on headquarters air conditioner, $266.50. This *126 repair was made to prevent condensation from forming and running inside the attic; this expenditure was incurred for maintenance of the headquarters building. (8) Work on main bridge, $665; work on pond levee and ditches, $2,640. No repair work was involved in the work on the main bridge. The work on the pond levee and ditches, consisting of removal of sediment from the ditches and redepositing it on the levee, was for maintenance purposes. (9) Canal excavation, $4,000. This involved an extension of the canal used for oil lessee traffic. The carryoff canal (lying outside petitioner's land), into which petitioner's canal drained, was closed off by the Lafourche Levee District in 1964. Thereafter, however, petitioner's canal continued to be usable as a means of interior transportation. (10) Truck license, $10; work on motor vehicles and supplies, $525.68. The latter covered the following items: Item
Cost
Repair of outboard motors
$389.66
Hasp, hinges, and lock and items without invoices
13.69
Pickup repair (header and intake valves)
88.87
Battery and transmission oil for pickup 33.46
Total
$525.68 The pickup was used to transport supplies used in capital *127 construction as well as for repair and maintenance. (11) Motor fuels and lubricants, $1,360.02; helicopter and seaplane, $569.17. Portions of these items were not shown to have been expended in petitioner's business. The following table sets forth for the items in issue for 1962 the amounts which must be capitalized, the amounts which are deductible expenses for that year, and the amounts which are neither: Item
Amountin Issue
To beCapitalized
To beExpensed
To beDisallowed
Surveys
$ 846.68
$ 846.68
Blueprint copy
9.52
9.52
Petroleum engineer
621.76
621.76
Weed killer
505.88
505.88
Exterminator
120.00
120.00
Sand and shells
18.00
18.00
Electricity
563.83
563.83
Painting
1,293.00
1,293.00
Electrical work
232.60
$ 214.10
18.50
Hardware supplies
1,819.27
844.74
974.53
Work on air conditioner
266.50
266.50
Work on main bridge
665.00
665.00
Work on levee and ditches
2,640.00
2,640.00
Canal excavation
4,000.00
4,000.00
Work on motor vehicles
525.68
60.00
465.68
Truck license
10.00
10.00
Motor fuels, lubricants
1,360.02
560.02
$ 800.00
Helicopter, seaplane 569.17
269.17
300.00
Total
$16,066.91
$5,783.84
$9,183.07
$1,100.00
*128 1963 Petitioner claimed, and respondent disallowed, deductions for repairs and maintenance for 1963 in the total amount of $13,209.23. Petitioner concedes that $1,762.27 of these deductions constitutes capital expenditures. A description of the items remaining in issue and the amounts deducted for each follows: (1) Sand and shells, $1,748.25. These materials were used for maintenance (grading and filling potholes) of the access and 997 levee top roads to the extent of $1,150, [3] the remainder being used in the construction of a "turn-around" at the headquarters building, a road to the hog pen, and other capital improvements. (2) Work on headquarters foundation, $2,053. The headquarters rested on piles, and due to a defect in the original construction the piles on one side began to sink, causing the building to tilt. Petitioner had a concrete wall constructed over the sinking piles and new piles driven to support the wall. These repairs cost $1,788, and an additional $265 was expended for fill for the foundation. Had petitioner not remedied this defect the building would *129 have been rendered useless. The work did not increase the useful life which the building would have had if properly constructed initially. (3) Insurance premiums, $1,290.80. Premiums in the amount of $291.92 were for a fire and extended coverage policy on the headquarters. Another premium, in the amount of $25.13, was for liability insurance on a Buick station wagon, which was used for a variety of purposes, some of which were business, others personal, in character; $6.50 of this premium was attributable to petitioner's business. The remaining premiums, totaling $973.75, were paid on joint policies for owner's, landlord's, and tenant's liability insurance covering petitioner's premises and the premises of Bayou Verret Land Co., Inc., an adjacent tract of approximately 1,271 acres; only $723.50 of these premiums was attributable to petitioner's premises. (4) Public utility electricity, $742.69. Of this amount, a part (e.g., $5.57 in December) was paid for electricity supplied to a Louisiana Avenue address (with an account number different from the one used by petitioner) not shown to be related to petitioner's business. Petitioner paid and properly deducted $700 for electricity *130 used for business purposes; respondent properly disallowed $42.69 of the claimed deduction. (5) Floral design, $25.75. This expenditure was incurred for an employee's funeral. (6) Court cost, $3; maps for damage suit, $200. These expenditures were incurred in connection with a suit against Jefferson Parish for damages arising from the construction of a drainage canal through petitioner's land. (7) Telephone line, $1,674. This expense was attributable to the installation by the telephone company of 3,500 feet of buried telephone cable in order to inaugurate telephone service. (8) Electrical work, $56.45. This item consisted of the replacement of a jet charger pump and reconnection of broken wiring in the headquarters, at a cost of $22.71, and minor work on the stove in the headquarters and replacement of a broken switch box on the bridge, at a cost of $33.74. (9) Work on engines and boats, $992.83; weed killer, $172.38. The former item consisted of maintenance work on the boats used primarily for chopping lilies. The invoices supporting these expenditures cover such items as paint, motor tune-ups, repair and adjustment of magnetos, carburetors, points and plugs, drive shafts, *131 gear assembly, and labor. Closely related to this work was the weed killer. (10) Helicopter, $200; dinner discussions, $10.30; tires, $176.64. These items were not shown to be related to petitioner's business. (11) Lumber material, $139.85; hardware supplies, $9.27; temporary labor, $200; signs, $67.98. The first three items were related to capital construction. The useful lives of the signs were greater than one year. (12) Butane gas, $17.06. The butane gas used in the caretaker's house was part of employee's compensation. (13) Work on truck and auto, $304.57; truck license, $12. The following expenditures were deducted as auto repairs and maintenance: Item
Amount
Rebuilding pickup transmission, replacing wheel bearing
$ 71.18
Cleaning and repairing pickup seat
24.72
Pickup general lubrication
9.91
Changing pickup cylinder head, repairing exhaust system, radiator and brakes
128.60
Repair of car with which pickup collided 70.16
Total
$304.57 Petitioner also paid $12 for license plates for the pickup. (14) Motor fuels, $1,350.14. Invoices reflect that a substantial portion of these expenditures were made for the individual benefit of Carlos Marcello, *132 a stockholder of petitioner. The remainder was used for the caretaker's pickup truck, for operation 998 of the lily-cutting boats, and for other business operations. The record does not show that expenditures for motor fuels used for business purposes in excess of $650 were made in 1963. The following table sets forth for the items in issue for 1963 the amounts which must be capitalized, the amounts which are deductible expenses for that year, and the amounts which are neither: Item
Amount in Issue
To be Capitalized
To be Expensed
To be Disallowed
Sand and shells
$ 1,748.25
$ 598.25
$1,150.00
Headquarters foundation
2,053.00
2,053.00
Insurance premiums
1,290.80
1,021.92
$ 268.88
Electricity
742.69
700.00
42.69
Floral design
25.75
25.75
Court costs
3.00
3.00
Maps for damage suit
200.00
200.00
Telephone line
1,674.00
1,674.00
Electrical work
56.45
56.45
Work on engines and boats
992.83
992.83
Weed killer
172.38
172.38
Helicopter
200.00
200.00
Dinner discussions
10.30
10.30
Tires
176.64
176.64
Lumber material
139.85
139.85
Hardware supplies
9.27
9.27
Temporary labor
200.00
200.00
Signs
67.98
67.98
Butane gas
17.06
17.06
Auto repair
304.57
304.57
Truck license
12.00
12.00
Motor fuels 1,350.14
650.00
700.14
Total
$11,446.96
$2,892.35
$7,155.96
$1,398.65
*133 1964 Petitioner claimed, and respondent disallowed, deductions for repairs and maintenance for 1964 in the total amount of $10,583.98. Petitioner concedes that $1,633.73 of these deductions constitutes capital expenditures. A description of the items remaining in issue and the amounts deducted follows: (1) Expenditures for the following items were incurred for the same purposes in 1964 as for similar items in 1963, and were current business expenses: Butane fuel, weed killer, paint supplies, survey services and materials, work on lily cutter and outboard motors, and marsh buggy rentals. Sand, shells, and riprap were used to maintain existing roads. (2) Travel and telephone, $307.54; tires, $135.10. Petitioner failed to substantiate the deduction claimed for travel and telephone. The tires were not used for petitioner's business purposes. (3) Repair of storm damage to the headquarters roof, $80; supplies, $28.22; temporary labor, $100; welding of construction manhole cover and ladder, $68.43; repair of the fan of the deep freezer in the headquarters, $32.66; testing of the headquarters electric range, $9. These items constituted minor repair work and were properly deducted. *134 (4) Work on pickup, $240.57. The pickup truck had been sold prior to the date on which this expenditure was incurred, and the latter thus was not shown to be a business expense. (5) Public utility electricity, $846.91; telephone service, $295.34. Electricity was furnished to the Louisiana Avenue account ($83.94) and to the caretaker's house and headquarters ($762.97). The electricity for the Louisiana Avenue address was not shown to be related to any business of petitioner. The telephone service was a business expense. (6) Hardware supplies, $324.56. These supplies consisted of the following: Item
Amount
Materials for chicken house
$146.79
(chicken wire, lumber, and water piping)
Random small purchases of lumber
164.32
Paint supplies 13.45
Total
$324.56 These items were used in the repair and maintenance of petitioner's facilities. 999 (7) Caretaker out-of-pocket expenses, $281.51. These expenses consisted of the following: Item
Amount
Wheelbarrow body, padlock, can opener, and broom
$ 11.14
Three yards of concrete
41.72
Small items (gaskets, nuts, paint, screws, nails, etc.) 228.65
Total
$281.51 The concrete was used *135 for capital construction. (8) Motor fuels, $2,813.36. These expenditures were incurred as follows: Purchaser
Amount
Carlos Marcello
$ 757.97
Petitioner's employees
1,124.39
Unsupported by invoices 931.00
Total
$2,813.36 The purchases made by Carlos Marcello and the purchases unsupported by invoices were not shown to be business expenses of petitioner. The fuels purchased by petitioner's employees were used for business purposes. The following table sets forth for the items in issue for 1964 the amounts which are deductible expenses for that year and the amounts which are not allowable: Item
Amount in
To be
To be Issue Expensed Disallowed
Butane fuel
$ 149.61
$ 149.61
Weed killer
165.00
165.00
Paint supplies
26.11
26.11
Surveys
67.40
67.40
Survey materials
1.85
1.85
Work on lily cutter motors
719.62
719.62
Work on outboard motors
45.32
45.32
Marsh buggy rental
525.00
525.00
Sand, shells, and riprap
1,687.00
1,687.00
Travel and telephone
307.54
$ 307.54
Tires
135.10
135.10
Roof repair
80.00
80.00
Supplies
28.22
28.22
Temporary labor
100.00
100.00
Welding
68.43
68.43
Deep freezer fan repair
32.66
32.66
Electric range testing
9.00
9.00
Work on pickup
240.57
240.57
Electricity
846.91
762.97
83.94
Telephone
295.34
295.34
Hardware supplies
324.56
324.56
Caretaker out-of-pocket expenses * 281.51
239.79
Motor fuels 2,813.36
1,124.39
1,688.97
Total
** $8,950.11
$6,212.48
$2,695.91
*136 * Of this amount, $41.72 must be capitalized. ** The discrepancy of $0.14 between the amount deducted $10,583.98) and the sum of the amount conceded ($1,633.73) plus the total amount in issue is unexplained by the record. Issue 2. Depreciation Petitioner claimed deductions for depreciation, all of which respondent disallowed as follows: Depreciable Asset
1960
1961
1962
1963
1964
1961 Chevrolet pickup truck
$140.07
$560.26
$560.26
$ 560.26
Boat
83.33
333.33
$ 333.33
Buick station wagon
430.31
860.64
Jeep station wagon
281.52
Total
$140.07
$560.26
$643.59
$1,323.90
$1,475.49
The Chevrolet pickup was used by the caretaker and other employees of petitioner to perform maintenance work on petitioner's land and to transport materials and supplies. The materials and supplies so transported were used in both capital construction and repair and maintenance work. The allowable depreciation on the pickup is as follows: 1960
1961
1962
1963
$70.04
$280.13
$560.26
$560.26 1000 The balance of the depreciation claimed on the pickup for 1960 and 1961 was part of petitioner's capital *137 expenditures in connection with its construction program, which was substantially completed by the beginning of 1962. The Buick station wagon was used for a variety of purposes, some of which were business, others personal, in character. These purposes included trips to conferences with public officials concerning drainage problems, meetings with oil lessees, transportation of visitors, supplies, and materials, and commuting trips by petitioner's officers. Depreciation on the Buick is allowable in the amounts of $107.58 and $215.16 for 1963 and 1964, respectively. The remainder of the claimed depreciation is attributable to nonbusiness use. The record does not show any business use of the Jeep station wagon; nor does it identify any boat acquired in 1962 which was devoted to business use. Issue 3. Insurance and Sundry Expenses Petitioner claimed, and respondent disallowed, deductions under the headings "Insurance" and "Sundry Expenses" for insurance premiums paid for 1960, 1961, and 1962 as follows: Policy
1960
1961
1962
Liability insurance on 1961 Chevrolet pickup
$159.08
$ 151.08
Fire and extended coverage on caretaker's house and pumphouse
115.00
89.70
Fire and extended coverage on headquarters building
$ 408.11
291.92
Joint public liability (owner's landlord's, and tenant's) for petitioner and Bayou Verret Land Co., Inc.
618.00
625.98
Total
$274.08
$1,026.11
$1,158.68
*138 Of the premiums for the insurance on the pickup, $79.54 for 1960 was a capital expenditure, and the remainder for 1960 and the full amount for 1962 represented current business expenses. The expenditures for insurance on the caretaker's dwelling, pumphouse, and headquarters also were current business expenses. However, of the $408.11 deducted for such insurance for 1961, $291.92 was also deducted, and has been allowed above, as part of the repairs and maintenance expenses for that year. The portion of the premiums covering the joint policies issued for petitioner and Bayou Verret Land Co., Inc., attributable to petitioner's property was $450 for each of the years 1961 and 1962. No part of this insurance expense constituted a capital outlay. Issue 4. Truck Repairs For 1960 petitioner claimed, and respondent disallowed, a deduction of $226.67 for truck repairs. Of this sum, $25.75 was expended for installation of a special purpose bumper on the pickup and was a capital expenditure. The record does not show that the remaining $200.92 was a current expense. Issue 5. Salaries and Wages Petitioner claimed deductions for salaries and wages as follows: 1960
1961
1962
1963
1964
Net salaries and wages
$1,581.55
$4,706.68
$4,131.65
$4,181.48
$1,927.49
Withholding and social security taxes
1,228.20
981.64
653.26
159.50
Gross salaries and wages
$1,581.55
$5,934.88
$5,113.29
$4,834.74
$2,086.99
*139 Respondent disallowed these deductions. One of petitioner's employees was Norbert Allemand (hereinafter Norbert). His duties consisted of rebuilding the pump - this was his primary activity in 1960 - transporting supplies (as indicated by his signature on invoices for supplies which were picked up at the vendors), guarding the property against trespassers, and checking the levee for breaks. The latter activity was carried on primarily in 1961 and in later years, after the levee was rebuilt. 1001 Norbert was the only employee to whom petitioner paid wages in 1960. During 1961 petitioner paid gross wages to Norbert in the total amount of $3,600. On January 11, 1961, petitioner employed Margarette M. Ritchie, at a salary of $100 per month, and her son, Harry Ritchie, Jr., at a salary of $50 per month. Margarette's duties included general cleaning of the headquarters, keeping out trespassers, and checking visitors entering the premises to fish. Petitioner had decided that it was necessary to allow local residents to fish on its property, since fishing had been permitted in the ponds area for some 35 years and petitioner feared that an absolute prohibition would lead to vandalism. *140 Petitioner issued passes - 500 in all - permitting fishing only in the ponds area and prohibiting visitors from going into the area of the headquarters. Harry's duties included helping Margarette control the activities of visitors and destroying water lilies which interfered with the operation of the pump. Harry and Margarette terminated their employment with petitioner in 1962, and Robia Falghou and Sydney Oncaie were employed as their replacements. Lee J. Richoux was hired to assume the duties which had been performed by Norbert prior to his death in 1963. With the exception of the full amount of Norbert's wages in 1960 and one-half of his wages (and related taxes) in 1961, which were capital expenditures related to rebuilding the pump and assisting in petitioner's construction program carried out in those years, the wages, salaries, and related taxes paid by petitioner during the years in issue constituted current business expenses. Issue 6. Legal Expenses For 1961, 1962, 1963, and 1964 petitioner claimed, and respondent disallowed, deductions for legal expenses as follows: Year
Amount Claimed
Amount Disallowed
1961
$7,121.64
$6,271.64
1962
1,250.00
200.00
1963
3,366.10
1,866.10
1964
1,325.00
500.00
*141 Of the disputed amounts, $4,600.87 in 1961 and $1,566.10 in 1963 were paid to Camille Cutrone or to his law firm, Faris, Leake & Emmett (later Faris, Leake & Cutrone). The 1961 legal fees included a payment of $3,100.87, which arose from a transaction with California Oil Company. As part of the consideration for an oil and gas lease, that company had obligated itself to reimburse petitioner for legal fees incurred by the latter in connection with the negotiation and preparation of the lease. California Oil Company sent Cutrone a check for $3,163, which included $62.13 for reimbursement of related costs, payable to petitioner, and by letter dated November 15, 1961, Cutrone forwarded the check to petitioner. Petitioner deposited the check in its bank account and then issued its own check to Cutrone for $3,163. Petitioner reported the $3,163 as income from the oil and gas lease, and claimed an offsetting deduction of $3,100.87 in its return. The remaining $1,500 of the legal fees paid to Cutrone in 1961 were attributable to the negotiation and preparation of a servitude which was granted to Jefferson Parish. The 1963 fee paid to Cutrone for legal services covered the negotiation and *142 preparation of an oil and gas lease pertaining to approximately 541 acres in petitioner's tract and 11 acres owned by Bayou Verret Land Co., Inc. Petitioner paid to Phillip B. Smith, an attorney, $1,670.77 in 1961, $200 in 1962, and $200 in 1963. These payments included fees for Smith's representation of petitioner in negotiations relating to the location of rights of way it granted to the Lafourche Levee District and for his preparation of agreements conveying such rights of way. In addition, they covered compensation for attending meetings pertaining to a new canal to drain petitioner's land, as well as for incidental services in connection with the negotiation of an oil and gas lease. In 1963 petitioner paid an attorney, John Constant, $100 for legal services in clearing a cloud on petitioner's title to a portion of its property. In 1964 petitioner paid an attorney, Warren Simon, $500 as reimbursement for a deposit made with a court on the commencement of a suit against Jefferson Parish to recover damages resulting from the unathorized excavation of a canal across petitioner's land. The suit was settled under an agreement pursuant to which the Parish agreed to assume the maintenance *143 of the access road leading to petitioner's headquarters. All the fees paid to Camille Cutrone, or his law firm, and to Phillip B. Smith were deductible business expenses. The payments to John Constant in 1963 and Warren Simon in 1964 were capital expenditures. Issue 7. Release of Damages During 1961 Republic Natural Gas Company (hereinafter Republic) oil drillers, 1002 excavated an access canal through petitioner's acreage and the property adjacent thereto, the "Elsie M. Churchill Tract," to a drill site which was located on petitioner's land. In the process of such excavation damage was sustained by both properties. Republic paid petitioner and the owners of the Elsie M. Churchill Tract "[for] all damages, both actual and residual, which have resulted from * * * dredging operations and from the construction or the normal use of the said canal * * *," in exchange for which petitioner and the owners of the Elsie M. Churchill Tract executed damage releases and servitude agreements relating to the canal. The payments by Republic were as follows: To petitioner, $12,600 for damage to its property and an additional $1,400 as consideration for the servitude agreement, a total *144 of $14,000; to the owners of the Elsie M. Churchill Tract, a total of $11,000 for damages and their servitude agreement. Title to the Elsie M. Churchill Tract was vested one-half in Elsie M. Churchill and one-half in Vincent C. Rodriguez. Rodriguez, in fact, beneficially owned only 2 percent of the one-half interest which was held in his name; he held the remaining 98 percent of this one-half interest as nominee for J. Folse Roy, who, in turn, held half of the 98 percent interest as nominee for Carlos Marcello. J. Folse Roy and Carlos Marcello owned substantial amounts of petitioner's outstanding stock during the years in controversy. Upon receipt of the $14,000 from Republic petitioner paid $5,000 to Rodriguez. Based on this payment, petitioner claimed a deduction for $3,600 ($5,000 minus the $1,400 received by petitioner from Republic as consideration for the servitude) under the heading "Release of Damages." Respondent disallowed the claimed deduction. None of the $5,000 payment to Vincent Rodriguez was a current business expense of petitioner. Issue 8. Supervisor's Fee Petitioner claimed, and respondent disallowed, deductions of $10,000 for each of the years 1962 and *145 1963 for a "Supervisor Fee." At the annual meeting of petitioner's shareholders on February 12, 1962, J. Folse Roy, petitioner's executive vice president, was given broad authority to do what he deemed necessary with respect to "the construction of roads, levees, bridges, canals and granting servitudes wherever necessary." At a special meeting of petitioner's board of directors on November 30, 1962, Roy reported that he had employed Carlos Marcello "for a fee of $10,000 for the year 1962, as supervisor to act in that capacity in all matters relative to drainage" of petitioner's tract. Petitioner paid Carlos Marcello $10,000 for 1963 as well as for 1962. Carlos Marcello did liaison work for petitioner with the board of the Lafourche Levee District and with personnel of the Louisiana Department of Public Works, participated in oil leasing activities, and made frequent visits to petitioner's property to observe the oil drilling activities thereon. Carlos Marcello was neither an officer nor director of petitioner during 1962 and 1963. Reasonable compensation for the services performed by Carlos Marcello was $3,000 for each of the years 1962 and 1963. The balance of the payments made *146 to him in those years was neither a current business expense of the corporation nor a capital expenditure. Issue 9. Miscellaneous Expense For 1963 petitioner claimed as a deduction a "Miscellaneous" expense in the amount of $1,164.66, which respondent disallowed. The record does not disclose the purpose for which this sum was expended. Issue 10. Depletion Petitioner reported as gross income royalty bonuses received in 1961 in the amount of $23,988 and claimed a deduction for depletion thereon, at the rate of 27 1/2 percent, of $6,596.70. The $23,988 included $3,163 received from the California Oil Company, one of petitioner's lessees, as reimbursement for petitioner's legal expenses in connection with its lease. Such legal expenses were computed at the rate of approximately 50 cents per acre, and California Oil Company obligated itself to make the reimbursement as part of the consideration for the lease. As stated in our Findings under Issue 6 above, petitioner issued its check to an attorney, Carmille Cutrone, to pay him for the legal services performed in negotiating the lease. Respondent disallowed the depletion ($869.82) attributable to the $3,163 received from California *147 Oil Company. The $3,163 received from California Oil Company by petitioner in 1961 1003 was part of its gross income from the property for depletion purposes. For 1963 petitioner claimed a deduction for depletion in the amount of $15,691.6o, of which respondent disallowed $2,374.72. The disallowed portion of the deduction is attributable to a deposit made by petitioner on June 24, 1963, in the amount of $8,635.38. This deposit was not shown to be gross income from the property for depletion purposes. Issue 11. Personal Holding Company For 1959 through 1964 petitioner's reported gross income consisted of the royalty bonuses it received upon the execution of oil and gas leases. Petitioner claimed corresponding depletion deductions thereon as follows: Year
Bonus Reported
Depletion Deducted
1959 * $31,231.80
$ 8,588.75
1960
83,125.00
22,859.38
1961
23,988.00
6,596.70
1962
29,700.00
8,167.50
1963
57,060.38
15,691.60
1964
37,425.00
10,291.88
* Petitioner's gross income for this year also included a $350 rental payment on a hunting and fishing lease. For the same years petitioner returned as income amounts representing depletion *148 deducted in the immediately preceding year, certain of which amounts respondent adjusted, as follows: Year
Restored Depletion Reported
Adjustments by Respondent
Restored Depletion per Respondent
1959
$16,488.45
$16,488.45
1960
16,488.45
$7,899. 70
8,588.75
1961
22,859.38
22,859.38
1962
6,596.70
869.82
5,726.88
1963
8,167.50
8,167.50
1964
15,691.60
2,374.72
13,316.88 Respondent's adjustment for 1960 was occasioned by the fact that petitioner had claimed depletion in 1959 only to the extent of $8,588.75. The adjustments for 1962 and 1964 correspond to respondent's determinations, discussed under Issue 10 above, that part of the depletion deductions claimed by petitioner for 1961 and 1963 were not allowable. The following table sets forth petitioner's gross income and section 162 deductions, other than compensation for personal services rendered by shareholders, [4] for each of the years in issue: 1959
1960
1961
1962
1963
1964
Gross Income
$31,581.80
$83,125.00
$23,988.00
$29,700.00
$57,060.38
$37,425.00
Sec. 162 Deductions:
Repairs and Maintenance
6,616.54
7,236.97
9,183.07
7,155.96
6,212.48
Insurance
194.54
566.19
982.70
Salaries and Wages
4,134.88
5,113.29
4,834.74
2,086.99
Legal Fees
683.94
601.27
7,121.64
1,250.00
3,266.10
825.00
Advertising
50.00
Contribution
150.00
Taxes
717.47
1,563.48
2,044.71
680.40
839.81
1,369.53
Miscellaneous 71.26
21.50
Total Deductions
$ 1,472.67
$ 9,175.83
$21,104.83
$17,230.96
$16,150.61
$10,494.00
*149 Petitioner's deductions, exclusive of compensation paid to shareholders, were less than 15 percent of its gross income for 1959 and 1960, and exceeded 15 percent of its gross income for 1961, 1962, and 1963. For 1964 petitioner's royalty income, adjusted for property and severance taxes, depreciation, depletion, interest, and rent paid, was at least 50 percent of petitioner's adjusted ordinary gross income. Petitioner had no other personal holding company income in 1964. Petitioner's deductions allowable under section 162 constituted at least 15 percent of its adjusted ordinary gross income for 1964. Opinion Issue 1. Repairs and Maintenance Implicit in our findings that substantial deductions for repairs and maintenance are allowable for 1960 through 1964 is a rejection of respondent's broad position that all (or virtually all) of petitioner's outlays during those years should be capitalized under 1004 section 263(a) (1) *150 [5] as part of the cost of a grand design, initiated by the change in its management in 1960, for the improvement, development, and ultimate sale of its land. Cf. United States v. Wehrli, 400 F. 2d 686 (C.A. 10, 1968); Stoeltzing v. Commissioner [59-1 USTC 9444], 266 F. 2d 374 (C.A. 3, 1959), affirming a Memorandum Opinion of this Court; I.M. Cowell, 18 B.T.A. 997 1002 (1930). We recognize the validity of the rule that the cost of an item which is part of a plan of rehabilitation and modernization must be capitalized, even though, standing alone, the item may appropriately be classified as repair. But, notwithstanding the fact that certain of the expenses may be of value when and if petitioner decides to develop its property for residential or commercial uses, as we view the evidence the plans for developing the land were too nebulous in the years before us to justify treating all otherwise currently deductible expenses as capital expenditures. *151 Not all of petitioner's outlays, however, are deductible as business expenses. Some of the extensive construction and rebuilding of the headquarters facilities was capital in nature, either as incident to a plan of renovation or as work which materially prolonged the useful lives of capital assets. Cf. sec. 1.162-4, Income Tax Regs. The caretaker's dwelling, the storage building, the pumphouse, the boathouse, the wharves, the access road, and the levee around the ponds area had not been repaired for years and had become virtually unusable. The expenditures to rebuild them were incurred to place, rather than to keep, them in an ordinarily efficient condition; hence these outlays must be capitalized. See Jones v. Commissioner, 242 F. 2d 616, 620 (C.A. 5, 1957), affirming [Dec. 21,098] 24 T.C. 563 (1955); Bloomfield Stemship Co., 33 T.C. 75 (1959), affirmed per curiam 285 F. 2d 431 (C.A. 5, 1961); Stoeltzing v. Commissioner, supra. In allowing deductions for repair of the foundation of the headquarters building [6] and for electricity, and other similar items related to the headquarters, *152 we have rejected respondent's contention that the structure was not a business building at all, but a fishing lodge maintained for the entertainment of Carlos Marcello and his friends. There is no substantial evidence to support this argument and it is based almost entirely on suspicion. Indeed, the only testimony on the subject is to the contrary. Respondent emphasizes that some insurance policies and similar papers described the headquarters building as a "fishing lodge," that permits were issued to numerous individuals to fish in the ponds area, and that plans for the building were copied from plans used for houses located in a nearby residential development. In doing so, however, respondent overlooks important factors inconsistent with his contention. Thus, although the ponds *153 area was indeed used extensively for fishing prior to 1960, it was thereafter closed to all except individuals to whom permits were issued. Fishing permits were issued, but as a means of controlling the fishing on the property, not as a means of encouraging it. Finally, that the building was designed as a residence rather than a traditional office building is consistent with the hope of petitioner's officers and stockholders that the area would eventually be developed for residential purposes and that the building would then blend into the community. While the building, on occasion, may have been used for fishing parties and other social purposes, on this record we are compelled to conclude that such uses were de minimis. Petitioner was engaged in managing its 4,200-acre tract of land, which was producing substantial amounts of income annually, a total of $231,000 in the five years here in controversy, from oil leasing activities. Petitioner's representatives carried on extensive negotiations with its lessees - the oil and gas leases contained numerous special provisions to the advantage of petitioner, such as a one-sixth rather than the standard one-eighth royalty in some of the *154 leases; release of all except 60 of each 320 acres 1005 in the event that petitioner's property should be subdivided; and provisions relating to the location and dredging of canals and the like - with representatives of the Lafourche Levee District and Jefferson Parish on plans for draining petitioner's property, and with certain individuals interested in purchasing the property. According to the record, many of these negotiations were held at the headquarters building, where petitioner's maps and records were located. We do not think the outlay for a headquarters building and related facilities for office use were excessive when viewed in the light of petitioner's current income and its potential future income from development of its property. In drawing the often narrow line between capital expenditures and current expenses in classifying the numerous individual items here involved, we recognize that a more just result might have been reached administratively rather than through the formal procedures of trial. However, since the parties failed to reach an accord, we have attempted to draw that line in the light of the facts before us, applying well recognized legal principles. *155 [7]
Only a few of the individual items require special discussion. Respondent argues that petitioner's liability insurance was necessitated by construction activity and hence must be capitalized. See Herbert Shainberg, 33 T.C. 241, 250 (1959). However, the liability policies covered petitioner's structures throughout all the years in question, during a substantial part of which no construction activity was under way, and provided broader coverage than construction liability. Cf. Rev. Rul. 66-373, 1966-2 C.B. 103. Since the policies protected against the general risks arising from petitioner's business and land ownership, they were properly expensed. See sec. 1.162-1(a), Income Tax Regs.
*156 The deductibility of the survey expenses poses a more difficult problem. It is clear that these expenses are deductible to the extent that petitioner was merely resurveying and remarking its boundaries.[8] See Brier Hill Collieries, 12 B.T.A. 500, 507-508 (1928), affirmed in part 50 F. 2d 777 (C.A. 6, 1931). On the other hand, to the extent that survey services - e.g., the placement of section markers - yielded benefits over a period of years, they must be capitalized. See Louisiana Land & Exploration Co., 7 T.C. 507, 515-516 (1946), affd. 161 F. 2d 842 (C.A. 5, 1947). Accordingly, we have concluded that portions of these expenditures during the years in question must be capitalized and portions must be expensed. See Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930).
We have rejected petitioner's argument that the outlay of $4,000 in 1962 for the *157 excavation of a canal should be expensed because the canal was established solely as an access route for current oil and gas leasing activities. The care taken by petitioner's officers in negotiations with the oil leasing companies respecting the location of canals to be dredged by the latter - with a view to the ultimate use of the canals in the development of the property - convinces us that this canal, while usable in supervising oil leasing activities, had a useful life substantially in excess of the current tax year, and its cost must be capitalized. See sec. 1.263(a)-2(a), Income Tax Regs. Petitioner's alternative contention that the cost of constructing the canal is deductible for 1962 as a business loss because the access to the canal was closed off in 1964 by the Lafourche Levee District also cannot be sustained. There is no evidence that all business uses of the canal, or possibilities therefor, terminated by such closing; and even if they did terminate, due to the closing in 1964, petitioner would not be entitled to a business loss deduction therefor in 1962. Petitioner incurred court costs and expenditures for maps as the result of a suit *158 it instituted in 1963 against Jefferson Parish for damages caused by the latter's construction of a canal through petitioner's land. The claim was settled under an agreement calling for the Parish to assume the maintenance of petitioner's access road. Had petitioner received a judgment for damages, the excess of the recovery over its basis in the land would have been taxed as capital 1006 gain. See Inaja Land Co., Ltd., 9 T.C. 727 (1947). Accordingly, the expenditures connected with the suit are capital. Cf. Isaac G. Johnson & Co. v. United States, 149 F. 2d 851, 852 (C.A. 2, 1945); Arthur T. Galt, 19 T.C. 892, 912 (1953), reversed in part on other grounds 216 F. 2d 41 (C.A. 7, 1954), certiorari denied 348 U.S. 951 (1955). The installation in 1963 of the underground telephone cable - a prerequisite to installation of telephone service - added value to petitioner's land which extended beyond the tax year. The fact that petitioner did not have any property rights in the cable does not prevent this expenditure from being capital in nature. Cf. Scovill Manufacturing Co.25 B.T.A. 265, 277 (1932); E. W. *159 Edwards & Son v. Clarke, 29 F. Supp. 671, 673 (N.D.N.Y. 1939). In making our findings respecting a number of other expenditures, particularly those not shown to be related to petitioner's business, we have relied upon Cohan v. Commissioner, supra, in allocating them to nondeductible items, to capital expenditures, or to deductible expenses. Issue 2. Depreciation In determining petitioner's allowable depreciation deductions on the 1961 Chevrolet pickup and the Buick station wagon, on the basis of the capital, business, and nonbusiness use of those vehicles, we have again relied upon Cohan v. Commissioner, supra. In concluding that a part of the allowable depreciation on the 1961 Chevrolet pickup should be capitalized, we have followed the rule laid down in L. W. Brooks, Jr., 50 T.C. 927, 936 (1968); and Great Northern Railway Co., 8 B.T.A. 225, 263 (1927). The parties have stipulated that the capital cost of the headquarters and related facilities should be depreciated at the rate of 5 percent per annum. Issue 3. Insurance and Sundry Expenses Petitioner deducted some of its outlays for insurance under the *160 heading "Repairs and Maintenance," some under the heading "Insurance," and others under the heading "Sundry Expenses." The Findings on this issue relate solely to the deductions claimed in the latter two categories, and, as we stated therein, duplicate deductions were claimed for 1961 in the amount of $291.92. Consistent with our conclusion as to the deductions for depreciation on the 1961 Chevrolet pickup, see Issue 2 above, we have allocated the 1960 premiums for that truck between capital expenditures and current expenses on the basis of the use to which it was put. See Cohan v. Commissioner, supra. Since construction activity was substantially completed prior to the beginning of 1962, we have allowed as a deduction the full amount of the premiums for the truck for 1962. We have also applied the Cohan rule in arriving at the amounts of the deductions to which petitioner is entitled for 1961 and 1962 for the premiums paid on the joint liability policy issued to it and Bayou Verret Land Co., Inc., taking into account primarily the acreage owned by the two corporations. Issue 4. Truck Repairs Petitioner argues that the amount of $200.92, included in the item for *161 truck repairs, was expended to repair an old truck which had so deteriorated that it was not in running condition, and refers us to check stub no. 38 and Exhibit 149-R. The check stub indicates that a portion of the total payment covered "truck repair." However, the invoice included in Exhibit 149-R does not appear to relate to the repair of a truck, but rather to repair of an engine evidently designed for marine use. For lack of substantiating evidence we have concluded that this item is not a currently deductible expense. Respondent has conceded that it may be capitalized. Issue 5. Salaries and Wages The record indicates that, as an employee of petitioner, Norbert devoted most of his time in 1960 and part of his time in 1961 to rebuilding the pump and transporting materials and supplies used in connection with petitioner's program of renovating the headquarters facilities. We have, therefore, concluded that all of his salary for 1960 and one-half of his salary for 1961 should be capitalized. In allocating his 1961 salary between current business expenses and capital expenditures, we have relied upon the principle of Cohan v. Commissioner, supra. Implicit in our *162 allowance of deductions for wages and salaries is a rejection of respondent's broad contention that none of these payments constituted business expenditures. We are satisfied that the duties performed by the individuals to whom these 1007 wages were paid were reasonably necessary for the protection and maintenance of petitioner's property. Issue 6. Legal Expenses We think it clear that petitioner is entitled to deduct the legal fees it paid Cutrone for assistance in the negotiation and drafting of oil and gas leases which produced taxable income. We find no merit in respondent's position that the $3,163 payment by California Oil Company constituted trust funds erroneously reported by petitioner as taxable income - an error for which petitioner would have no recourse at this time. [9] As to the legal fees for negotiation and preparation of servitude agreements and for assistance in negotiations relating to the location of canals and rights of way, we hold that they are also currently deductible as part of petitioner's expenses of managing its property. In our view, as discussed in connection with Issue 1 above, plans for the development and ultimate sale of petitioner's property *163 were too nebulous to require capitalization of these expenses. The legal fees paid to John Constant, however, were compensation for services in clearing petitioner's title, and it is well established that the cost of defending or perfecting title to property is a capital expenditure. Spangler v. Commissioner, 323 F. 2d 913, 919 (C.A. 9, 1963), affirming a Memorandum Opinion of this Court. The reasons for capitalizing the fee paid to Warren Simon are set forth above (Issue 1, 1963) in our discussion of court costs and maps for the damage suit, with which the fee was related. Issue 7. Release of Damages Petitioner contends that $3,600 of the payment to Rodriguez was deductible "on the ground that, as the invitor of the oil company, it is responsible to strangers for trespass of the invitee while on business of petitioner. Republic settled for its own trespass, but left [petitioner] liable for permitting it." However, whereas Republic obtained a release from all the Elsie M. Churchill Tract owners, petitioner did not purport to obtain a release from anyone except Rodriguez, and he held record *164 title to only one-half, and beneficial ownership of only a tiny fraction, of the Tract. Rodriguez was, in fact, the nominee for J. Folse Roy who, in turn, held half of his interest for the benefit of Carlos Marcello, and both Roy and Marcello owned substantial amounts of petitioner's stock. Without deciding whether petitioner would have been derivatively liable under Louisiana law for damages caused by Republic, [10] we conclude on these facts that this payment was only an imaginative attempt to withdraw funds from petitioner for the benefit of its two principal shareholders, J. Folse Roy and Carlos Marcello. Issue 8. Supervisor's Fee The record is confusing, and at times contradictory, as to the duties *165 performed by Carlos Marcello. While the minutes of the shareholders' and board of directors' meetings referred to in our Findings indicate that his duties consisted of supervising drainage work, Marcello himself testified that "I was out there for the repairs, to see the road would be repaired and the levy [sic] would be repaired and see that the bridges were fixed and stuff like that. We had people coming out to look at the place, people who wanted to buy it or lease it for oil or timber, stuff like that, all that sort of thing." J. Folse Roy testified that Marcello's work "was related 60 per cent to the oil business and 40 per cent to the levy [sic] board work." Yet there is no evidence that Marcello is either a petroleum engineer or a drainage engineer, or that he has had experience in either the oil business or drainage matters. In addition, Marcello testified that he devoted a substantial amount of his time to other business endeavors, particularly investments and the operations of a number of motels. Although petitioner had paid dividends in the years 1958 through 1960, it paid none during 1961, 1962, and 1963 (the latter two years covering the period during which Marcello *166 was employed as supervisor) and Marcello owned, directly or indirectly, a substantial stock interest in petitioner. Using our best judgment in the light of the record before us, we have concluded that only 30 percent, $3,000 per year, of the 1008 sums paid to Carlos Marcello during 1962 and 1963 was reasonable compensation for his services and that the balance was a distribution of corporate profits to him. Issue 9. Miscellaneous Expense As to this item, since petitioner failed to introduce any evidence at all to support the deduction, we sustained respondent's determination. Issue 10. Depletion As consideration for the California Oil Company lease petitioner received a cash bonus, the right to receive delay rentals under stated conditions, and royalties from production. In addition, petitioner received the right to reimbursement for agreed fees paid to its attorney in connection with the negotiation of the lease, computed at approximately 50 cents per acre. Quite clearly, the cash bonus was "gross income from the property" for purposes of computing the depletion allowance under section 613.[11] See, e.g., Palmer v. Bender, 287 U.S. 551 (1933); Herring v. Commissioner, 293 U.S. 322 (1934). *167 On the facts here presented, we think it additionally clear that the reimbursement of legal fees was also a part of the bonus received by the petitioner for execution of the lease, and that the amount of such reimbursement should be treated as part of its gross income from the property. Cf. Callahan Mining Corp., 51 T.C. 1005 (1969); Louisiana Land and Exploration Company v. Donnelly, 394 F. 2d 273, 279 (C.A. 5, 1968); Handelman v. United States, 387 F. 2d 694, 698 (Ct. Cl. 1966); Winifred E. Higgins, 33 T.C. 161 (1959); Burt v. United States, 170 F. Supp. 953 (Ct. Cl. 1959). *168 Computing the deduction for depletion in this manner does not in any sense constitute the allowance of depletion on attorney's fees, as respondent argues. Of course, legal fees as such are not part of the proceeds of production. But when reimbursement for such fees is received by the lessor pursuant to a formula agreed upon by the parties to the lease, that reimbursement is part of the yardstick which measures the lessor's share of the total income from the production of the oil and is part of the cash outlay which the lessee is required to make in order to acquire the lease. In lieu of reimbursement for legal fees petitioner could have insisted upon a larger cash bonus or royalty share, and either of these would clearly have been depletable income. Consistent with the reasoning in the cases cited above, all of which relate to the payment of state taxes by the lessee, we hold that petitioner is entitled to a depletion deduction for 1961 computed by including in its gross income from the property the reimbursement received from California Oil Company. Our holding in this respect requires a corresponding adjustment to respondent's determination regarding the amount of income included *169 in petitioner's gross income for 1962 when the lease was canceled without production. As to the disallowance of a portion of the depletion deduction claimed by petitioner in 1963, the record contains no evidence establishing that the $8,635.38 deposited on June 24, 1963, was income subject to depletion. Since the burden of proof rested with petitioner on this issue, we sustain respondent's determination. Issue 11. Personal Holding Company 1959-1963 Pre-1964 [12] section 542(a)(1) [13] defined "personal holding company" to mean any 1009 poration, with exceptions not here relevant, if at least 80 percent of its gross income for the taxable year was personal holding company income. Pertinent to the present controversy, pre-1964 section 543(a)(8) defined "personal holding company income" to include - (8) * * * Mineral, oil, or gas royalties, unless - (A) such royalties constitute 50 percent or more of the gross income, and (B) the deductions allowable under section 162 (relating to trade or business expenses) other than compensation for personal services rendered by the shareholders, constitute 15 percent or more of the gross income. In our opinion in Bayou Verret Land Co., 52 T.C. No. 105, decided this day, we concluded that bonuses received as consideration for the execution of oil and gas leases, but not sums corresponding with amounts previously deducted as depletion and returned as income pursuant to section 1.612-3(a)(2), Income Tax Regs., were "mineral, oil, or gas royalties" within the meaning of pre-1964 section 543(a)(8), and hence constituted personal holding company income. We also held therein that previously deducted depletion, when "returned as income," is not part of "gross income" for the purposes of the 80 percent requirement of pre-1964 section 542(a)(1). We follow these holdings here and proceed with the mathematical computations prescribed by pre-1964 sections 542(a)(1) and 543(a) (8)(B). It is clear that personal holding company income constituted more than 80 percent of petitioner's gross income in each of the years in issue. However, as detailed in our Findings, petitioner's "royalty" income exceeded 50 percent of its gross income in each of these years (indeed, except for a $350 receipt in 1959, all of petitioner's gross income was "royalty" income), and its section 162 deductions constituted more than 15 percent of its gross income for 1961, 1962, and 1963. Accordingly, under pre-1964 section 543(a)(8)(A) and (B), petitioner was not a personal holding company for 1961, 1962, and 1963. However, since petitioner's section 162 deductions did not exceed 15 perecnt of its gross income for 1959 and 1960, it was a personal holding company for those years. Petitioner's principal argument, other than reliance on the percentage limitation of pre-1964 section 543(a)(8)(B), is that its bonus income was not "royalties," but was "rent" within the meaning of pre-1964 section 543 (a)(7), [14] with the result that it was not a personal holding company. Petitioner introduced into evidence 24 agreements relating to the leasing of its properties over the years 1952 through 1964. Each of these leases provided for a bonus and also for delay rentals. However, not only has petitioner offered no evidence to show that any of the payments received during the years before us were delay rentals rather than bonuses, but the evidence that was presented indicates that such payments were indeed bonuses. For example, the tax returns described the payments as "Royalty Bonus Received." While bonuses are depletable income, see, e.g., Herring v. Commissioner, supra, delay rentals are not. See Houston Farms Development Co. v. United States, 131 F. 2d 577 (C.A. 5, 1942); J.T. Sneed, Jr., 33 B.T.A. 478, 483 (1935). Yet petitioner claimed depletion deductions on all of its oil leasing income. Furthermore, in each of the years before us petitioner returned as income, pursuant to section 1.612-3(a)(2), Income Tax Regs., a sum equal to the depletion deduction claimed in the immediately preceding year, thus indicating that the leases were each terminated within one year without production and that only bonus payments, not delay rentals, were involved. *170 While the deficiency notice redetermines for 1961 and 1963 the amount returnable in these years as previously deducted depletion, the notice, in substance, accepts petitioner's treatment of both the bonus and the previously deducted depletion. The burden thus rested with petitioner to show that the reported bonus payments were rent, and this petitioner failed to do. 1010 For all the foregoing reasons we have applied *171 pre-1964 section 543(a)(8), relating to mineral, oil, and gas royalties, rather than pre-1964 section 543(a)(7), relating to rents, without burdening our Findings with the contents of all the leases or undertaking a complete analysis of them in this Opinion. [15]
*172 In deciding whether petitioner had deductions allowable under section 162 constituting 15 percent or more of its gross income for the years prior to 1964, we have treated the expenditures for repairs and maintenance, insurance, salaries and wages, legal fees, taxes, advertising, contributions, and miscellaneous expenses as section 162 deductions. Neither the directors' fees nor the supervisor's fees may be so treated since such compensation was paid to individuals who were shareholders. Pre-1964 sec. 543 (a)(8)(B). 1964 Under the personal holding company provisions in effect for taxable years beginning in 1964 and subsequent years, any corporation, with exceptions not applicable here, is subject to the tax if, among other requirements, at least 60 percent of its adjusted ordinary gross income is personal holding company income. Sec. 542(a)(1). "Mineral, oil and gas royalties," adjusted, pursuant to section 543(b)(2)(B), for depreciation, depletion, property and severance taxes, interest, and rent paid, are personal holding company income unless each of the following tests prescribed by section 543 (a)(3) is met: (1) The adjusted royalty is at least 50 percent of the adjusted *173 ordinary gross income; (2) other personal holding company income is not more than 10 percent of the ordinary gross income; and (3) section 162 deductions are at least 15 percent of adjusted ordinary gross income. Under these standards we have concluded that petitioner is not subject to the personal holding company tax for 1964. As noted in our Findings, it clearly meets all the requirements of section 543(a)(3). We reach this conclusion notwithstanding that the precise amount of petitioner's depreciation deduction for 1964 will have to await the Rule 50 computation, since even without the benefit of that deduction petitioner is not subject to the tax. Issue 12. Additions to Tax Respondent determined additions to tax under section 6653(a) [16] for each of the years 1960 through 1964. That section imposes an addition to tax if any part of any underpayment is "due to negligence or intentional disregard of rules and regulations (but without intent to defraud)." Petitioner bears the burden to show that no negligence or intentional disregard of rules and regulations occurred. See Marcello v. Commissioner, 380 F. 2d 499, 505-507 (C.A. 5, 1967), modifying a Memorandum Opinion *174 of this Court. Petitioner offered no evidence to show that its underpayments were not attributable to negligence. In addition, petitioner has conceded that portions of the deductions taken for repairs and maintenance during each of the years in question should have been capitalized, but has not offered any explanation for this overstatement of current deductions. Further affirmative evidence of negligence is found in the facts that petitioner claimed deductions for 1961 and 1963 for insurance policies covering another taxpayer, that it claimed duplicate deductions for 1961 for the same insurance expense, and that the deductions for 1961 through 1963 for motor fuels included expenses *175 incurred for the personal benefit of a shareholder. Imposition of the section 6653(a) additions to tax is sustained. Decision will be entered under Rule 50. 1011 Footnotes
1. This case was tried in consolidation with Carlos Marcello, Docket No. 3532-64; Anthony and Jeannine Marcello, Docket No. 3533-64; Jacqueline Marcello, Docket No. 3534-64; Carlos and Jacqueline Marcello, Docket Nos. 3744-65 and 2908-66; Salvador J. and Florence Marcello, Docket Nos. 3535-64 and 3981-65; Joseph C. and Barbara Marcello, Docket Nos. 3743-65 and 2907-66; Frank and Lady Patricia Occhipinti, Docket No. 5691-65; Rosario and Julia Occhipinti, Docket No. 5760-65; and Bayou Verret Land Co., Inc., Docket No. 6308-66. The present case is severed for a separate opinion.↩
2. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.↩
3. This amount includes $66 attributable to sand used in fill for the headquarters foundation.↩
4. The supervisor's fees, see Issue 8 above, were paid to a shareholder of petitioner. Directors' fees of $2,500 for each of the years 1959, 1960, and 1961 were not shown to have been paid to individuals who were not shareholders of petitioner.↩
5. SEC. 263. CAPITAL EXPENDITURES. (a) General Rule. - No deduction shall be allowed for - (1) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate. * * * * * *↩
6. Since the purpose of the foundation repair work was not to improve or prolong the useful life of the headquarters, but to keep it in a usable condition, these outlays were properly expensed. See American Bemberg Corp., 10 T.C. 361, 376-377 (1948), affirmed per curiam 177 F. 2d 200 (C.A. 6, 1949); cf. Illinois Merchants Trust Co., Executor, 4 B.T.A. 103↩ (1926).
7. See secs. 1.162-4, 1.263(a)-2(a), Income Tax Regs.; Jones v. Commissioner, 242 F. 2d 616 (C.A. 5, 1957), affirming 24 T.C. 563 (1955); Bloomfield Steamship Co., 33 T.C. 75 (1959), affirmed per curiam 285 F. 2d 431 (C.A. 5, 1961); Herbert Shainberg, 33 T.C. 241, 250 (1959); Illinois Merchants Trust Co., Executor, supra↩; see generally, 4A Mertens, Law of Federal Income Taxation, sec. 25.20.
8. Although J. Folse Roy's report to the stockholders of December 12, 1961, states that one of the purposes of the survey was to clear up some problems with respect to the title to petitioner's land, there is no evidence that petitioner's title was ever challenged.↩
9. See our further discussion of this payment under Issue 10 below.↩
10. Republic acquired its leasehold interest from Humble Oil & Refining Company, and Humble's lease with petitioner provided that "all provisions hereof shall * * * bind the successors and assigns of Lessor and Lessee * * *" and that "Lessee assumes all responsibility for any damages resulting to Lessor as a result of Lessee's operations hereunder and Lessee agrees to indemnify, defend and hold Lessor harmless against any claims by third parties for damages arising hereunder."↩
11. SEC. 613. PERCENTAGE DEPLETION. (a) General Rule. - In the case of the mines, wells, and other natural deposits listed in subsection (b), the allowance for depletion under section 611 shall be the percentage, specified in subsection (b), of the gross income from the property excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property * * * (b) Percentage Depletion Rates. - The mines, wells, and other natural deposits, and the percentages, referred to in subsection (a) are as follows: (1) 27 1/2 percent - oil and gas wells. * * *↩
12. The personal holding company provisions of the 1954 Code were amended by section 225 of the Revenue Act of 1964, 78 Stat. 19, applicable to taxable years beginning after December 31, 1963. For convenience, references to the sections applicable only to taxable years beginning prior to January 1, 1964, will be preceded by the term "pre-1964." ↩
13. SEC. 542. DEFINITION OF PERSONAL HOLDING COMPANY. (a) General Rule. - For purposes of this subtitle, the term "personal holding company" means any corporation (other than a corporation described in subsection (c)) if - (1) Gross Income Requirement. - At least 80 percent of its gross income for the taxable year is personal holding company income as defined in section 543, and * * * ↩
14. SEC. 543. PERSONAL HOLDING COMPANY INCOME. (a) General Rule. - For purposes of this subtitle, the term "personal holding company income" means the portion of the gross income which consists of: * * * (7) Rents. - Rents, unless constituting 50 percent or more of the gross income. For purposes of this paragraph, the term "rents" means compensation, however designated, for the use of, or right to use, property, and the interest on debts owed to the corporation, to the extent such debts represent the price for which real property held primarily for sale to customers in the ordinary course of its trade or business was sold or exchanged by the corporation; but does not include amounts constituting personal holding company income under paragraph (6). * * *↩
15. Petitioner appears to rely primarily upon the lease of December 19, 1961, with California Oil Company, Exhibit 136-Q. This lease, in consideration of $1,000, gave the lessee six months in which to conduct seismograph and other exploratory tests on 4,165 acres. At the end of the six months the lessee could select all or part of the land for lease, for a "primary term" of five years from the selection date, upon payment of a "bonus" of $20 per acre. The lessee selected 1,485 acres and paid petitioner $29,700 in 1962. Petitioner maintains that the payment was, in fact, rent, not a bonus. But as we read the lease, the payment of $20 per acre to be made upon the selection of acreage for lease for the five-year primary term was indeed a bonus, as it is called in the agreement. And, we note, petitioner so reported it in its 1962 return, claimed depletion thereon, and reported the restored depletion in its 1963 income.↩
16. SEC. 6653. FAILURE TO PAY TAX. (a) Negligence or Intentional Disregard of Rules and Regulations with Respect to Income or Gift Taxes. - If any part of any underpayment (as defined in subsection (c)(1) of any tax imposed by subtitle A or by chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment. e * * *↩